FILED
2014 Mar-14  PM 03:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **PATRICIA ANN BAGBY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5-12-CV-2759-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I. Introduction**

On October 28, 2009, the claimant, Patricia Ann Bagby, applied for supplemental security income under Title XVI of the Social Security Act.  (R. 108-114).  The claimant alleges disability commencing on October 22, 2009 because of post-traumatic stress disorder, a panic disorder with agoraphobia, a major depressive disorder, and attention deficit hyperactivity disorder.  (R. 35-36).  The Commissioner denied the claim both initially and on reconsideration. (R. 57-61).

The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on January 20, 2011.  (R. 64).  In a decision dated February 25, 2011, the ALJ found that the claimant was not disabled within the meaning of the Social Security Act and, thus, was ineligible for supplemental security income.  (R. 10).  On May 15, 2011, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the

1

final decision of the Commissioner of the Social Security Administration. (R. 3-5). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

For the reasons stated below, this court reverses and remands the decision of the Commissioner.

## II. Issues Presented

Whether the Appeals Council erred in evaluating newly submitted evidence and failing to remand the case to the ALJ.

## III. Standard of Review

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. The court does not review *de novo* the Commissioner's factual determinations, but only affirms if substantial evidence supports his findings. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but the court must also

2

view the record in its entirety and take into account evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. Legal Standard

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

When the claimant submits "new and material" evidence "relat[ing] to the period on or before the date of the administrative law judge hearing decision" to the Appeals Council after the ALJ hearing, and the Appeals Council makes the new evidence part of the record, this court may determine that the failure of the Appeals Council to adequately consider that evidence warrants a remand. *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987). Such evidence is considered material and potentially worthy of remand when the Appeals Council did not consider it if "there

is a reasonable possibility the new evidence would change the administrative outcome." *Id.* The Appeals Council may not merely "perfunctorily adhere" to the ALJ's general reasoning when it considers the new evidence but upholds the ALJ's decision; instead it must adequately explain why it denied review. *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1987); *see also Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253 (11th Cir. 2007) (holding that remand was appropriate in light of new evidence presented to the Appeals Council to determine if the ALJ's finding was still supported by substantial evidence). This court has the authority to remand a case based on such new evidence pursuant to 42 U.S.C. § 405(g), under a sentence four remand or reversal. *Id.*; *see also* 20 C.F.R. §§ 404.940, 404.946.

### V. Facts

The claimant has a high school education and was 51 years old at the time of the administrative hearing. She has no past relevant work. The claimant alleges that she is unable to work because of post-traumatic stress disorder, a panic disorder with agoraphobia, a major depressive disorder, and attention deficit hyperactivity disorder. (R. 35-36).

*Mental Limitations*

Dr. Benita Swartout of Hanceville Health Center examined the claimant three times, initially on July 9, 2009. At that first visit, the claimant complained of two years of depression and panic attacks and indicated that she could not stop crying. She further claimed to have lost 25 pounds during the previous six months. Dr. Swartout diagnosed the claimant with anxiety, depression and panic disorder. She prescribed Celexa and encouraged the claimant to exercise for stress relief. (R. 188-189).

Dr. Swartout next examined the claimant two weeks later on July 23, 2009.  At that second visit, the claimant told Dr. Swartout that Celexa was "really helping" and that she felt better but was still anxious and jittery.  Dr. Swartout noted that the claimant's anxiety and agitation had improved, but that her depressive symptoms had not resolved.  She instructed the claimant to continue on Celexa and begin taking Buspirone as well.  (R. 186-187).

The claimant last saw Dr. Swartout on August 7, 2009, less than a month after her initial visit.  The claimant complained of fatigue, sleep difficulties, dizziness, and excessive crying. She further complained of side effects from her medications, black outs, diarrhea, and falling six times in one week.  She told the doctor that her sister had come to stay with her because she was too nervous to stay alone.  Dr. Swartout noted her depressive symptoms, anxiety and agitation, and diagnosed her with depression and severe anxiety without suicidal ideations.  Dr. Swartout noted that medication was not helping, and that the claimant was willing to see a psychiatrist. She referred the patient to Dr. Deborah Gordon at Cullman Primary Care Family Counseling Center.  (R. 184-185).

Dr. Deborah Gordon initially examined the claimant on October 20, 2009.  The claimant told the doctor about her panic attacks and waking in the middle of the night, but being able to return to sleep.  Dr. Gordon noted the claimant's appropriate appearance, cooperative attitude, clear and coherent speech, good eye contact, linear and logical thought, and adequate judgment. She also noted the claimant's poor memory, attention, and concentration.  She described the claimant as depressed, anxious, tremulous, sad, and tearful.  She noted the claimant's family history of domestic violence and alcoholism.  Dr. Gordon diagnosed the claimant with chronic and severe post-traumatic stress disorder, major depressive disorder, panic attacks, and attention

5

deficit hyperactivity disorder.  She prescribed Pristiq and gave the claimant a handout on relaxation exercises.  (R. 199-202).

Dr. Mary Arnold, the state's psychologist, evaluated the claimant on December 8, 2009 and reviewed records provided by the Disability Determination Services.  Her report noted that the claimant, whom she deemed a reliable informant, denied substance abuse and had no history of suicide attempt.  She was seeing a psychiatrist, and had been taking Klonopin and Prestiq since November, 2009.  Dr. Arnold noted that the claimant was well-groomed and had refined social skills, but that her mood was anxious with congruent affect.  She found that the claimant demonstrated fluid speech and made eye contact.  Further, Dr. Arnold noted that the claimant was alert and oriented in all spheres, was able to understand instructions, and could mentally perform simple monetary calculations and numerical sequencing.  Regarding her daily activity, Dr. Arnold reported that the claimant groomed and dressed independently, maintained a neat household, and managed her business affairs.  Additionally, the claimant reported to Dr. Arnold that she watches "House" and "Bones" on DVD, listens to classic rock and easy listening on the radio, and maintains social relationships with her mother, her siblings and a close friend.  Finally, Dr. Arnold diagnosed the claimant with an adjustment disorder and an anxiety disorder, and ascribed to her a GAF of 57.  (R. 203-206).

At the request of the DDS, Dr. Robert Estock completed a Psychiatric Review Technique on January 6, 2010 based on the claimant's medical records.  He found that the claimant had adjustment disorder and anxiety disorder, but that neither of these impairments precisely satisfied their respective diagnostic criteria.  Regarding her functional limitation, Dr. Estock found that the claimant had moderate restriction of activities of daily living; moderate difficulties maintaining

social function; moderate difficulties maintaining concentration, persistence, or pace; and no

episodes of decompensation of extended duration.  Dr. Estock concluded that the claimant's

allegations were moderately credible.  (R. 210-222).

Dr. Estock also completed a Mental Residual Functional Capacity Assessment on January

6, 2010.  Dr. Estock concluded that the claimant could understand and remember simple

instructions but not detailed ones, and that she could sustain attention to routine and familiar

tasks for extended periods.  Further, due to her adjustment disorder and depression, the claimant

would benefit from a flexible schedule and should be expected to miss one-to-two days of work

per month.  Dr. Estock stated that although the claimant would benefit from regular rest breaks,

she would nonetheless be able to maintain a work pace consistent with the mental demands of

competitive level work.  (R. 22-226).

In 2010, Dr. Gordon again examined the claimant on January 26, April 20, August 11,

and November 26.  At each of those visits, the doctor noted that the claimant was appropriately

dressed, neat, and clean; that she had a cooperative but guarded attitude, coherent speech and

good eye contact; that she was alert; and that she was oriented to time, place, person and

situation.  Repeatedly, Dr. Gordon described the claimant's mood as depressed and anxious with

feelings of helplessness, hopelessness and worthlessness.  She noted that the claimant had crying

spells, low energy, and a decreased appetite, but also that her speech was coherent, her thoughts

linear, and her judgment adequate.  Dr. Gordon repeatedly reiterated her diagnoses of major

depressive disorder, chronic post-traumatic stress disorder, panic disorder with agoraphobia, and

attention deficit hyperactivity disorder.  Dr. Gordon prescribed Klonopin and initially increased

the claimant's dosage of Pristiq before ultimately taking the claimant off Pristiq and putting her on Atterall. (R. 232-235, 239).

In contrast to previous visits, on August 11 and November 26, 2010, Dr. Gordon left unchecked all of the boxes on her session notes relating to depression, anxiety, and despairing feelings. She also billed those appointments as CPT code 90862, referring to pharmacological management with a minimal amount of psychotherapy. In contrast to all previous visits, on November 26, 2010, Dr. Gordon described the claimant's motor behavior as normal and her affect as euthymic. (R. 232-233).

On November 9, 2009, the claimant completed Function Report – Adult, where in her own words she described her daily functioning and emotional limitations. The claimant wrote that typically she awakens and cries, cares for her dog, sometimes makes her bed, attempts to do housework and laundry, and cooks one meal a day. She wrote that she maintains her personal hygiene and motivates herself when she doesn't "feel good." She wrote that she checks her calendar to confirm if she has appointments, or needs to go shopping. If she must leave the house, she attempts to hurry, so that she can return quickly. Regarding her limitations, the claimant wrote that some days she sits and cries all day; that loud noises disturb her; that she is afraid to be outside; that she has trouble focusing, remembering, and concentrating; and that she experiences feelings of anxiety and panic. (R. 144-150).

On November 29, 2010, Dr. Gordon completed, at the claimant's request, a Medical Assessment of Ability to do Work-Related Activities (Mental). Dr. Gordon rated the claimant as poor in the occupational adjustment categories of follows work rules, relates to co-workers, deals with the public, uses judgment, interacts with supervisors, deals with work stresses, and

maintains attention and concentration.  She rated the claimant as fair only in the category of functions independently.  She also noted the claimant's extreme sensitivity to noises, exaggerated startle response, and tendency to curl in the fetal position for self-protection.  Dr. Gordon diagnosed the claimant as having chronic post-traumatic stress disorder, severe panic disorder with agoraphobia, attention deficit hyperactivity disorder, and severe major depressive disorder. (R. 228-229).

In her assessment, Dr. Gordon wrote that, because of the claimant's extreme anxiety and depression, she had impaired memory and concentration, and her thoughts became easily fragmented and disorganized.  She concluded that the claimant had no ability to understand, remember, or carry out either simple, detailed, or complex job instructions.  Dr. Gordon also noted that the claimant had frequent panic attacks triggered by reminders of trauma, leaving her house, and being around others.  Dr. Gordon further concluded that the claimant was unable to demonstrate reliability, relate predictably in social situations, or behave in an emotionally stable manner.  Dr. Gordon described only as fair the claimant's ability to maintain her personal appearance.  She opined that all work-related areas were affected by the limitations she described.  (R. 252).

After the ALJ's decision, the claimant submitted additional evidence from Dr. Gordon to the Appeals Council.  Some of this evidence had already been before the ALJ when he made his decision.  Information that the ALJ had not seen were Dr. Gordon's notes from two treatment sessions, her completed Medical Source Statement of Ability to Do Work-Related Activities (Mental) dated April 4, 2011, and her letter "to whom it may concern" dated March 14, 2011. (R. 248-258).

The two additional treatment session notes were from November 19, 2009 and January 5, 2010. In both, Dr. Gordon observed that the claimant was appropriately dressed, neat, and clean; and described the claimant as depressed and anxious, with excessive worrying, feelings of helplessness, hopelessness and worthlessness. In the November 19 notes, Dr. Gordon wrote that that the claimant was not doing well and that her medication was not working, and she therefore started the claimant on Klonopin and increased her dosage of Pristiq. In the January 5 notes, Dr. Gordon noted that the claimant's medication was starting to work, but that her condition was worsening. (R. 248-249).

In the Medical Source Statement of Ability to Do Work-Related Activities (Mental) dated April 4, 2011, Dr. Gordon described the claimant's limitations as marked in understanding, remembering and carrying out simple instructions. She described the claimant's limitations as severe in all other work related categories, including making simple or complex judgments and understanding and carrying out complex instructions. Throughout the document, Dr. Gordon's handwritten notes simply referred back to the same form she completed on November 29, 2010, which was already in the record when the ALJ made his decision. (R. 253-255).

The last of the newly submitted evidence was Dr. Gordon's letter dated March 14, 2011, where she explained that her practice was to bill indigent and uninsured patients for brief medication management visits under CPT code 90862, even when she gave them more extensive treatment. She wrote that although she coded some of the claimant's visits to her office as 90862, she was actually providing 30 to 60 minutes of treatment each visit. (R. 257-258).

10

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing on January 20, 2011 before an ALJ.  (R. 33).

At the hearing, the claimant testified that she traces the origins of her chronic post-traumatic stress disorder, severe panic disorder with agoraphobia, severe major depression disorder and attention deficit hyperactivity disorder to parental alcoholism and domestic violence that she witnessed in childhood, an abortion in early adulthood, and the recent dissolution of her long-term marriage.  (R. 45-46).

The claimant testified that she was divorced and lived alone, although one of her sons stays with her sporadically.  She stated that she shops by herself once or twice a month, driving only to the closest store.  She stated that she tries to shop at off hours, when the store is less likely to be crowded.  She testified that she does her own housework, but only a little at a time.  (R. 36-37).  The claimant explained that on a typical day, she awakens and cries, but then attempts to make lists of what she needs to do, and makes check marks on the lists after completing tasks.  She stated that she pays her own bills, but tries to make all of her bill payments at once, thereby minimizing her trips outside.  (R. 46-47).  She testified that she has general aches and pains that she attributed to her depression.  (R. 38).

The claimant testified that she is afraid of strangers, people, crowds, and noise.  She stated that if she sees people laughing, she fears they are laughing at her.  (R. 36-37).  She testified that when she once witnessed an altercation at the market, she abandoned her cart and left the store.  She stated that she associates the general noises of her household appliances and the screeching of tires with angry voices.  That association triggers flashbacks and causes her to

11

want to hide.  She stated that she can tolerate watching the weather report on television, but newscasts and action scenes in movies are intolerable.  She stated that even chirping birds are upsetting.  (R. 44-47).

The ALJ asked the claimant to reconcile this noise intolerance with statements she made to Dr. Arnold in December, 2009 that she watches "Bones" and "House" on television.  The claimant told the ALJ that she no longer watches those programs because of both the noise and the disturbing content.  She further testified that she can now only tolerate listening to upbeat radio music at low volumes, which has the added benefit of drowning out disquieting household noises, like her refrigerator.  (R. 50).

Regarding her social interactions, the claimant stated that she does not go to church and does not make friends easily.  She said that she makes phone calls to her sons, her mother, and a cousin, but only when she has available cell phone minutes.  She said she fears her youngest son, and has had confrontations with him over his alcohol use and his relationships with women.  (R. 48-49).

The ALJ next questioned Patsy Bramlett, a vocational expert.  The ALJ posed a hypothetical to Ms. Bramlett for an individual aged 50 to 52 with a high school education, no work history, and no physical impairments.  He asked that she assume that work be non-exertional, unskilled, and require only occasional interaction with supervisors and coworkers. (R. 51-52).

The vocational expert testified that the following jobs exist for such an individual: inspector, with 800 jobs existing in Alabama and 49,000 nationally; hand packager, with 900

12

such jobs in Alabama and 49,000 nationally; and gluer, where 900 jobs exist in the state and 68,000 nationwide.  (52-53).

The ALJ next posed to Ms. Bramlett a hypothetical where the individual from the first set of facts has psychiatric problems that would preclude her from following work rules, relating to coworkers, dealing with the public, using judgment, managing work stresses, and maintaining attention or concentration.  The ALJ also added that such an individual would be unable to understand, remember and carry out even simple job instructions; would be unable to successfully behave in an emotionally stable manner; and could not relate traditionally in social situations or demonstrate reliability.  The vocational expert testified that the limitations posed in that hypothetical would eliminate all jobs.  (R. 53).

The ALJ then asked the effect if the same individual would be unable, because of poor stress management, to sustain a regular eight-hour work day and a 40-hour work week.  The vocational expert answered that such limitations would eliminate all jobs.  (R. 53).

The ALJ then asked if jobs would exist if the same individual would regularly miss a range of work days per month, starting at two, but going up to "five, or even higher."  The vocational expert answered that no jobs would exist for such an individual.  (R. 53-54).

Finally, the ALJ asked about the effect if the same individual would have to take excessive breaks.  The vocational expert again testified that no jobs would be available.  (R. 54).

*The ALJ's Decision*

On February 5, 2011, the ALJ issued a decision that the claimant was not disabled under the Social Security Act.  The ALJ found that the claimant had not engaged in substantial gainful activity since October 22, 2009, the initial application date.  (R. 15).

The ALJ further found that the claimant had the severe impairments of post-traumatic stress disorder, a panic disorder with agoraphobia, and a major depressive disorder.  Although the claimant's records also showed a diagnosis of attention deficit hyperactivity disorder, the ALJ found that the treatment records failed to show any specific findings, so he deemed that impairment non-severe.  (R. 15).

In assessing the claimant's mental impairments, the ALJ found evidence of only moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  Additionally, he found no evidence of episodes of decompensation of an extended duration.  The ALJ, therefore, concluded that the claimant's impairments, when considered individually or in combination, do not meet or equal a listing.  (R. 15).

The ALJ then considered whether, in spite of her impairments, the claimant has the residual functional capacity to work.  In assessing her RFC, the ALJ applied the pain standard to the claimant's subjective allegations and other symptoms.  The ALJ found that, while the claimant's impairments could reasonably be expected to cause limitations, the claimant's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible.  The ALJ concluded that the claimant's description of her activities did not represent disabling limitations and were not supported by medical evidence in the record.  (R. 16-17).

The ALJ based his conclusion on the inconsistency between the plaintiff's subjective description of her ability to perform activities of daily living and other evidence in the record. The ALJ considered specifically the November 2009 Function Report – Adult, the claimant's statements to Dr. Mary Arnold in December 2009, and the claimant's other statements at the

14

hearing, where she reported no significant limitations in her ability to take care of her personal needs, finances, housekeeping, and shopping.  The ALJ also noted that the claimant's description of her inability to tolerate television and other household noises was inconsistent with statements made 14 months earlier to Dr. Arnold.  (R. 16-17).

The ALJ then articulated three reasons for giving little weight to Dr. Deborah Gordon's opinion, in her November 29, 2010 report, that the claimant was unable to adapt to or perform work-related activities in 13 out of 15 areas, and had serious limitations in the remaining two areas.  First, the ALJ found that Dr. Gordon's assessment was not supported by substantial treatment records, which he characterized as only showing occasional treatment from Hanceville Health Center and Cullman Primary Care Family Counseling Center during a period beginning in July 2009.  The ALJ indicated that the insubstantial treatment record led him to conclude that Dr. Gordon was augmenting her assessment of the claimant's limitations to assist her in qualifying for disability benefits.  (R. 18).

Second, the ALJ found that the record showed a lack of duration of the claimant's limitations for the requisite 12 continuous months.  The ALJ supported this conclusion by examining Dr. Gordon's records.  He found that Dr. Gordon's use of the CPT code of 90862 in her session notes beginning in August 2010 demonstrated a significant change in the claimant's mental status, because that billing code indicates primarily a pharmacological visit with a minimal degree of psychotherapy.  The ALJ reasoned that minimal psychotherapy would be inappropriate treatment for a patient in the condition that Dr. Gordon described in November 2010, and inferred that those 90862 visits indicated that the claimant's condition had improved. (R. 18).

15

Finally, the ALJ stated he gave little weight to the opinion of Dr. Gordon because her opinion was inconsistent not only with her own more recent treatment records, but also with the opinion of Dr. Mary Arnold.  The ALJ noted that in her evaluation of the claimant in December 2009, Dr. Arnold assigned her a GAF of 57, consistent with moderate symptoms and moderate limitations.  Dr. Arnold, therefore, concluded that the claimant should only have occasional interaction with supervisors, co-workers and the public.  The ALJ further noted that Dr. Estock, the state agency's medical consultant agreed with Dr. Arnold's assessment, as he also opined the claimant had no more than moderate limitations in her ability to manage work-related demands. The ALJ gave Dr. Estock's opinion considerable weight, finding that it was consistent with the treatment the claimant received.  (R. 18).

Regarding her ability to work, the ALJ found that the claimant had a high school education and was able to communicate in English; that she had no past relevant work history and, therefore, transferability of job skills was not an issue; and that those facts combined with her residual functional capacity availed her of jobs existing in significant numbers in the national economy.  (R. 19).

The ALJ found that the claimant's ability to perform work at all exertional levels was compromised by her nonexertional limitations.  The ALJ explained that, at the hearing, he posed to the vocational expert hypothetical qualifications for an individual that matched the claimant's age, education, work experience, and residual functional capacity.  The ALJ noted that the vocational expert replied that a range of work existed in the national economy for such an individual.  The ALJ, therefore, concluded that the claimant would be capable of making a successful adjustment to working, that jobs did exist in significant numbers for her in the

16

national economy, and that she is, therefore, not disabled.  (R. 19).

*Discussion*

1. *The Appeals Council improperly evaluated newly submitted evidence.*

The claimant argues that the Appeals Council erred in failing to remand the matter to the ALJ based on claimant's newly submitted evidence from Dr. Gordon.  The court agrees and finds that a reasonable possibility exists that the evidence that the claimant submitted to the Appeals Council after the ALJ decision may have changed the administrative result had that evidence been before the ALJ initially.

The claimant in a proceeding may submit evidence without restriction until the ALJ renders his decision. 42 U.S.C. § 402(j)(2). The claimant may present new and material evidence to the Appeals Council, and the Council must consider such evidence in determining whether to review the ALJ's decision. 20 C.F.R. §§ 404.967, 404.970(b); *Falge v. Apfel*, 150 F.3d 1320, 1322-24 (11th Cir. 1998). New evidence is material if a reasonable possibility exists that the new evidence would change the administrative result. *Falge*, 150 F.3d  at 1323.

The Appeals Council must adequately explain why it denied review. *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1987); *see also Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253 (11th Cir. 2007) (holding that remand was appropriate in light of new evidence presented to the Appeals Council to determine if the ALJ's finding was still supported by substantial evidence).

After the ALJ's decision, the claimant submitted to the Appeals Council additional evidence, most of which was already in the record.  Not duplicative, however, were Dr. Gordon's psychiatric session notes from November 19, 2009 and January 5, 2010.  As these session notes

are substantially similar to those already submitted, the court finds no reasonably possibility that they would change the ALJ's decision.

However, the newly submitted evidence included a letter dated March 14, 2011, from Dr. Gordon in which she explained why her treatment notes showed billing for medication visits only.  In the letter, Dr. Gordon explained that she billed indigent and uninsured patients for brief visits under CPT code 90862, although she would actually provide 30 to 60 minutes of treatment per visit.  (R. 257-258).

In the present case, the Appeals Council acknowledged the new evidence and included it in the record, but in doing so only provide a truncated analysis; it stated that it considered the additional evidence but that the evidence "does not provide a basis for changing the [ALJ's] decision."  (R. 4).  The Appeals Council gave no explanation or discussion regarding the reasons for its finding.

Dr. Gordon's letter bears careful review, as it addresses two of the three reasons the ALJ articulated for discounting the treating doctor's opinion.  The ALJ noted specifically that Dr. Gordon's use of code 90862 indicated to him both that the claimant's condition had improved and that she was not receiving treatment in line with her alleged disability.

This court finds that, had the ALJ had before him and accepted Dr. Gordon's explanation in her March 14, 2011 letter regarding the use of the billing codes, a reasonable possibility exists that the ALJ may have given Dr. Gordon's opinion greater weight and, thus, possibly changed the ALJ's decision. The ALJ repeatedly relied on Dr. Gordon's billing codes to support his decision to give little weight to her medical opinion.  Because Dr. Gordon is a treating physician, the ALJ must afford her opinion great weight unless he shows good cause for discrediting her opinion.

18

*See Crawford v. Comm'r*, 363 F.3d 1155, 1159 (11th Cir. 2004).  Because Dr. Gordon's March 14, 2011 letter negates two of the three reasons the ALJ articulated for discrediting Dr. Gordon's medical opinion, the court finds that the ALJ may have reached a different conclusion regarding the weight to give the opinion had he had this new evidence before him.

As such, this court finds that the Appeals Council erred by failing to properly consider the new evidence submitted by the claimant and for not remanding the case to the ALJ based on that evidence.  This case should be reversed and remanded pursuant to 42 U.S.C. § 405(g).

### VI. Conclusion

For the reasons as stated, this court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED.

The court will enter a separate Order in accordance with this Memorandum Opinion.

DONE and ORDERED this 14th day of March, 2014.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE